Good morning. May it please the court, my name is Tom Brennan and I represent the appellant John Towery. Also here today is appellant Tom Rudd and my plan is to use five minutes to address the court, hand the baton over to counsel for Mr. Rudd and reserve two minutes for a rebuttal. Now let me make, so you get five, he gets eight? Five.  Yeah, or two and a half for rebuttal. So each of you wants roughly two, two and a half minutes for rebuttal? Okay. Okay, got it. And you've used half of it up by negotiating the time. Yeah. Let's start at 15 and then we'll go. Okay. Thank you. And just to clarify, this case, the court on a 12B6 motion. Oh, I'm sorry, I said summary judgment, yes. The issue before the district court was 12B6 and Rule 8, the sufficiency of pleadings, but nevertheless we're here on denial of review. Yeah, and again, this doesn't come out of your time, just so everyone understands. Summary judgment is when there's some evidence. 12B6 is when we have the complaint, which is the original document filed by the plaintiff. At the stage of 12B6, it's a motion to dismiss under that rule, we are required to believe anything in the complaint that is plausible. So we take as true statements in the complaint that may or may not prove to be true. For purposes of our decision now and for the purpose of the district court, we assume those statements to be true. Thank you. I just want to begin by saying that this case is not a case about government spies. This case is not a case about a vast government conspiracy involving multiple federal agencies and multiple local agencies to violate the First Amendment rights of the war protesters. Rather, this case is a case about a federal employee, in particular John Towery, who used his discretion to do his job to the best of his ability. He did infiltrate a citizen's protest group under a false name, however. Correct. Okay. And he did that in the context of the Ninth Circuit merit case and the Aguilar case. But this case really is about whether he is afforded qualified immunity, and that is the issue here. Now, do you concede when you move directly to qualified immunity that there was a violation? Your Honor, based on, and as you mentioned earlier, we take the allegations in the complaint as true. Based on the Third Amendment complaint as drafted, the language does not clearly give rise to a violation of a constitutional right violation. Now, certainly we all have a First Amendment right and a Fourth Amendment right to be free from government intrusion, but the allegations in this complaint do not necessarily set forth that type of analysis. And I want to hit on one thing here in particular. The Third Amendment complaint discusses the fact that Mr. Towery worked for the Department of the Army, that he worked within the Force Protection Unit, and within the Force Protection Unit his job was to make sure that goods and personnel that were transported from the Joint Base Lewis-McChord to the ports of Tacoma. I'm not entirely sure thinking about your comment a moment ago. Certainly if we characterize the complaint as does your adversary, and in fact are a conspiring endeavor to silence people by false arrest and so forth, if we view the complaint that way as adequate and plausible, where do you stand in terms of a possible immunity defense? Well, my And the point being, doesn't it just take us back to the adequacy of the complaint itself? I would argue the case is not plausible. First, if you look at Twombly, the Twombly court noted, you need to have a sufficient allegation as to each element of a cause of action. There are a couple of key things missing from this complaint. Where is the impermissible motive? So that's our discussion for today, because if we agree with you, all right, if we agree with you, we needn't get to the question of immunity. Well, you can The complaint fails. Qualified immunity analysis can be either whether there's a constitutional violation or the court could look at whether or not there was a clearly established right that was violated here. I would also argue that there's no clearly established right that would give Mr. Towery reasonable notice that the activities that he engaged in were a violation of the First Amendment or Fourth Amendment rights. That begs the question. Based on That begs the question. Judge Deary is positive, and I think Judge Fletcher as well, and I certainly have the question, is if the allegations in the complaint are accepted as true, the allegations in essence say that Mr. Towery and Mr. Rudd, Towery actively infiltrated under a false name. As I understand the allegations is that he used his insider position to push people into doing activities that they might not otherwise have done that would cause them to get crosswise with law enforcement, that he worked with law enforcement to get law enforcement to come crack down on these people, to discourage them from blocking transport, and that in the course of that activity that he was part and parcel of, there were false arrests and excessive force in dealing with the protesters. Now, if we say that that's a plausible and well-plaid circumstance, is it your position that Mr. Towery would not have clearly understood or that the law would have been clearly established that when he was doing it, that if he was doing those kinds of things and causing those kinds of activities, that was not clearly established? Thank you. No, that's not what I'm suggesting. If that is the allegation, then that would be a constitutional violation, but you can't – the problem is that there needs to be a nexus. There needs to be direct liability. A bit of his action cannot rest on vicarious liability. So, for instance – But Towery is not a supervisor, so he's not vicarious. But the key Fourth Amendment allegation here, an arrest that took place in Olympia in 2007, there is an effort here to tie Mr. Towery, who worked for the Department of Army, who had no association with the Olympia Police Department, that somehow because he interacted and infiltrated that group, that somehow conceivably, possibly, information was used that he gathered and that somehow he should be responsible for a possible Fourth Amendment excessive force arrest. That is the nexus that I'm trying to make a distinction here because it's consistent with the 2009 Moss case and the 2012 Moss case in this court I talked about. In particular, the 2012 Moss court case said there was an allegation that the supervisor officer directed the other officers to make the arrest. But the 2012 Moss court case said, wait a second, we need – you need to have a direct allegation that that officer said, I want you to use your police baton. I want you to use pepper spray to make that arrest. And therefore, the officer had reasonable, foreseeable knowledge that that might happen, that there might be a Fourth Amendment violation. The complaint alleges that although Mr. Towery may not have been formally associated with law enforcement, he met with law enforcement.  They identified possible people to be arrested who would be most effective in achieving whatever their ends might be. So whether there was a formal association or not, certainly there was this insinuation that there was this concerted effort by all, law enforcement as well as the intelligence group of which Mr. Towery was a part, to put a stop to this. And that's certainly clearly established. That was a point I was trying to make earlier, was the activity that Mr. Towery was engaged in was in order to do his job better. If he could get information that would help his unit understand how to move personnel and goods in a safe, efficient manner that protected public safety. Now, there might have been communications and meetings with other law enforcement agencies, but that was consistent with an obvious alternative explanation for his activities. There's a suggestion that there was a policy, that somehow Mr. Towery was involved in a policy with different agencies to suppress the free speech rights. If you look at the Iqbal case, there needs to be, there needs to be, find the policy. Show us the policy. And even in the first Moss case, there was the reference to a policy, that the Secret Service had a policy of treating the protesters differently. The court said, we can't just, you cannot allege a policy without providing a Twombly type standard of, give us the elements, give us, give us. I don't think this is a policy case. This is a case of, did he know as he was acting that his actions would result in violation of the constitutional amendment, constitutional rights? Well, based on a liability foreseeability analysis, I agree. I don't think it's reasonable to suggest. Yeah, but that's not, my point is, I don't think that's a question of policy. It's a question of fact. What did he know? What did he think was going to happen as a consequence of what he was doing? Okay. I would like to provide time for Mr. Rudd. Why don't you answer, or if you have any, and then we'll make sure that Mr. Rudd gets his full chance. So the question being whether it's a question of policy or a question of fact. Well, I don't want to focus, I prefer not to focus on policy. I want to focus on the fact that there's no impermissible motive here. There's no allegation of an impermissible motive on Mr. Towery's part. And there's no. There is. There is. The complaint in very general, in very conclusory terms, I grant you. But the complaint cries out by implication with every motive in the world to quiet these people. Well, while we sit the question, I'm not sure if I'm getting to that point. I'm sorry. Well, I think we probably understand each other. Why don't we at this point hear from Mr. Angelus representing Mr. Rudd. And we're going to run over a little bit in the argument. We'll make sure everybody gets a chance to say what he needs to say. May it please the Court, Theo Angelus for Mr. Rudd. I'd like to focus this morning on three points, Your Honor. First is that Mr. Rudd's individual actions did not violate plaintiff's constitutional rights, and there's no plausible allegation that he's responsible for the actions of other defendants. Second, plaintiffs have not shown, as they must under Mendocino or Skoog, that Mr. Rudd acted with the primary intention to disrupt constitutional rights, as opposed to acting consistently with his obligation to protect troops and equipment. And third — His primary intention, the correct intonation of which — It is because that's what courts have interpreted the but-for causation set forth in Skoog, as Mendocino is requiring. They've alternatively characterized it as either primary intention or but-for causation, which amounts to the same thing, Your Honor. And the third issue is that plaintiffs have not shown that any reasonable official in Mr. Rudd's position would have known that his individual actions were unconstitutional. To the contrary — Well, let me ask you this, though. I mean, he's obviously directing Mr. Towery. Well, Your Honor, I think the premise there — So first of all, the directing language in both Moss II and Chavez, the Court said, that alone is conclusory. Directing alone was not sufficient. But what he's directing Mr. Towery to do is to monitor the plaintiffs and to use an alias. That's what's plausibly — But as I read the complaint, whether he's actively directing Mr. Towery to do everything that Mr. Towery did or is merely knowledgeable about everything that Mr. Towery is doing may or may not be a material distinction for purposes here. I mean, Mr. Towery appears to have been a very conscientious employee, reporting to his boss exactly what he was doing. Well, the allegations — beyond conclusory allegations, there's only the allegation of reporting information and infiltrating using an alias. And in Presbyterian Church, Your Honor, you had exactly the same allegations. You had allegations of infiltrating using an alias, and you had allegations that there was First Amendment harm, that there was actual disruption to the church in question in that case. And the Court there found it was not clearly established that those actions alone would establish a violation of the First or the Fourth Amendment. And so qualified immunity applied. Here, the only — there are general allegations. I think Judge Geary was very correct. There are certainly general what this Court has called bald allegations of knowledge. But in Moss 1, what this Court said is that unless there are specific facts pled from which one can tie the allegations to constitutional violations, this Court can't supply those. That's an unreasonable inference. This Court can't save the complaint by implying allegations that don't exist there. Well, you know, we're in sort of midstream in figuring out what the combination of Dura and Twombly and Iqbal mean. One of the problems with any complaint is to try and figure out what is it — and I'm not talking now the language of those cases, but I'm talking the common sense behind them. What is it reasonable to expect that a plaintiff at the pleading stage would know or would not know? What kinds of things are uniquely in the knowledge of the defendants and can legitimately be expected to come out if they turn out to be true only in discovery? Which is why we talk about, well, is it plausible? Is it sufficiently detailed so that the defendant has a right to know — can figure out what's at stake, what he's being charged with doing? But if these are things that realistically can only be found out in discovery, I think it's a little hard on the plaintiff to say, well, you don't know these things, so we'll lose. Of course, Your Honor. But we can't hide information from the plaintiff and then charge him with not having that. But recall — Well, I won't say you're hiding. At this stage, you have no obligation to point it over. Of course, Your Honor. No, I agree. And in this case, plaintiffs have pleaded that they have the memoranda that allegedly formed the basis for their allegations against Mr. Rudd. And they haven't quoted them. They haven't said anything about them that supports either an inference of impermissible motive or that there was anything that Mr. Rudd did to violate their rights. Now, do you have those same memoranda? Yes, we do. Okay. Those were obtained via FOIA request, which is pleaded in the complaint, which is why I mentioned it. Right. But if those memoranda are very useful to you, you have the opportunity, even at this stage, to tell us what's in them. Well, Your Honor, we can't go beyond the pleadings. So we can only go with what plaintiffs have pleaded. And what they can't do, they can't push the burden on us to disprove the allegations that don't exist in their own complaint. So it is a generous standard that plaintiffs have, but they haven't, in this case, pleaded that Mr. Rudd's individual actions. Look at the allegations against Mr. Obregon in the Chavez case. That's a very similar circumstance to this one. They allege that Mr. Obregon's personal actions were violative, but the court said, no, when we look at exactly what he did, which was, in this case, cause infiltration and instruct the use of an alias, that standing alone is not a violation of constitutional rights. So for that reason, I respectfully indicate that Mr. Rudd, the claims against Mr. Rudd should be dismissed. And I'll reserve some time for rebuttal. Thank you. All right. Mr. Hildes. Thank you, Your Honors. Good morning, Your Honors. May it please the Court. I note again, I think Your Honors have already noted, that the burden is on the defendant's appellants to prove that the court erred below. This is a long statement. No, this is a statement. This is a question of law. Clear error is a factual determination. This is 12B6. I note that the court below did find the facts to be plausible, sufficient to meet the Iqbal standard on review. We have pledged 64 paragraphs of facts. We have detailed everything that we can detail pre-discovery as to what happened, based solely on information that was received from Public Records Act requests to the city of Olympia. The Army refused to provide anything in FOIA. Counsel suggested that the memos, for example, that you rely upon, which do seem to be a critical element of your proof, you have those. You haven't said what's in them. You just talk about them having been prepared by Mr. Towery and Mr. Rudd in various forms. If there is some conduct on their part, through their writings, to suggest that they were encouraging the law enforcement folks, who were the ones who actually went out in the field and confronted your clients, why wouldn't you have pledged that language so one could reasonably infer what, from the language, would lead one to believe, A, that they were intending to disrupt, and B, that they were pushing law enforcement to engage in acts that you allege they would not otherwise have done? We did not believe we needed to quote from them at this stage. I'm not answering my question. No, and I'm going to answer your question. We didn't believe we needed to. We were saving that for the discovery stage. But, in fact, there is a memorandum from May of 2008 describing demonstrations that were going to take place, and I don't have the memorandum with me. I apologize. It's not in the record in any event. No, but in the memorandum, Rudd, quoting Towery's information and discussions with him about demonstrations that were going to take place in Lakewood in May of 2008, said we need to prevent this from happening. Well, counsel, wait a minute. Nobody is disputing that Mr. Towery infiltrated this group and that he was in there for a purpose which they claim is to prevent interference with shipment of troops and war material into the port. So the statement in the memo that says we need to prevent this doesn't get you very far. That's self-evident from the fact that he was there, unless he was just on a casual drop-by for whatever period, long period of time he acted. So that doesn't help much. The word that he used in this memorandum is neutralize. We need to neutralize these demonstrations. I think I'm saying the same thing as Judge Fisher is saying. You're quoting from the memorandum. Is that memorandum or quoted language anywhere in your complaint? No. Well, yes, actually, yes. Okay. Show it to me in the complaint then. I'm looking at paragraph 2.22, but that is a paraphrase. Is this correct? I haven't seen any language in Iqbal or any of the others where we have to exactly quote from the memorandum. No, I understand, and you may be absolutely right on that point, but I don't want us to be now having quotations from memorandums when those quotations are not in the complaint. We look at what's in the complaint. Right. I agree, Your Honor. 2.22 is the most direct paraphrase of a memorandum. It's a specific memorandum from May of 2008 where Rudd discusses, these are the tactics we will use to disrupt, and he used the word neutralize. I did not use the word neutralize. Okay. The demonstration. It was military language, which was part of what inspired this case in the first place, is the fact that they were using military language to discuss how to respond to constitutionally protected activity, or even arguably occasional acts of civil disobedience, which is the worst thing that these folks did. It is framed as a military action to protect the convoys. This is not Iraq. This is the streets of western Washington. This is why the military should not be doing civilian law enforcement, and legally cannot under almost any circumstance, because if you treat people exercising their constitutional rights as an enemy forced to be neutralized, then the Constitution has no effect. We might as well be in a war zone in Olympia, Washington. May I direct your attention along that line to paragraph 2.6 of your complaint, second sentence. Towery and defended Rudd, it reads, influenced and directed tactics that were employed by the Tacoma Police Department and other agencies to disrupt the protests without cause or justification. Is there any other allegation that you can point to in the complaint that might provide or even suggest a factual basis for that statement? Part of it is that we attempted to do it sequentially. We then talk about the threat assessments and force protection memorandums from other agencies that were disseminated to law enforcement in 2.25. We specifically note the fact that Towery infiltrated the group in advance of the shipments. We focus a fair amount on Olympia 2007, because there is a lawsuit as to parts of what went on in Tacoma that's separate from this one, that the ACLU was doing involving arresting people for bringing backpacks into a search area. That's McCarthy v. No, that's Olympia. But that is the McCarthy case to some extent. We didn't include additional facts about this. We do, in fact, have memoranda about this. We have minute... This is your third amended complaint. Obviously, by this time, you know that your pleading is under particular scrutiny. But it was under particular scrutiny, Your Honor, by the city of Olympia. The reason that we amended three times is because they moved for a more definite statement, because we included facts not only about this case, but about the Love v. City of Olympia case and the strip searches in the jail. And the court directed us to clarify what was in which case. That's why we have amended. This was the first time any of these defendants moved to file an Iqbal motion, a 12 v. 6 motion, a Rule 8 motion. We had not been directed to clarify as to these allegations previously. We were laying out what had occurred, trying to tell the entire story in some depth. We focused, to some extent, more on the city of Olympia, because a great many of these arrests occurred in Olympia or among people going from Olympia to demonstrations. Let me ask you this. I think you just said it, but I want to make sure I understood it. You're telling me there's a procedural history here that we didn't get a 12 v. 6 to the parts of the complaint that are now being challenged by these defendants until we had the Third Amendment complaint? That is correct, Your Honor. Your Honor. So the district judge has not responded and asked you to amend further. The district judge just simply said, as to the things that are now in appeal, this is sufficient. That is correct. Had we been directed to amend on these allegations, we would have done so. We believe, because the court said so, that these were sufficient. We're telling the story in as much detail as we know, and we do not know the specifics of meetings between the city of Tacoma and Mr. Towery and Mr. Rudd. We know they occurred, but those we don't have records on. We know that Towery admitted to having been there back then. We know people knew him back then, and we know that arrests were taking place among people who had done nothing illegal and that they were barred from the sequence that maybe should be in here, is that they did a demonstration along the route of the convoys. I want to correct, by the way, this is not troop movement. Troops go out three weeks after the equipment. They come back three weeks before the equipment. This is soldiers taking equipment to the ports, soldiers taking equipment from the ports separate from the deployment. So this is just equipment. This is not an urgency. There are no troops being moved at this point. The equipment goes out. Three weeks later, if the equipment is ready, the troops go out. So in March of 2007, the demonstrators were along the route on a public sidewalk in the port and were actually having communication with soldiers saying things like, do you really want to go? How do you feel? The soldiers were talking back. The next two days later, the demonstrators were moved away from the route of the convoy. We know that that happened based on communications with the military, but those are not documents. Those are documents we will obtain in discovery. We're doing what we can do pre-discovery, as this court has said in the ‑‑ I'm sorry. Okay. As actually Your Honor said last year in Star of Ibaka, the standard for pleading is that all relevant facts do not need to be pled. They must just be sufficient that defendants can defend themselves adequately. The theory is that the party will then engage in extensive discovery to learn more about the underlying facts and then can move for judgment. Every FOIA to the Army was denied as involving secret documents and being inapplicable. We work off the documents that we manage to obtain publicly, which is all we can do. The defendants have not raised state secrecy, but at every opportunity pre-litigation, they have prevented us from obtaining documents. The only reason we have these documents is because a zealous clerk at the city of Olympia provided bunches and bunches of e‑mails that include the threat assessments and the discussions and the fact that these meetings would happen and discussions among the police afterwards about having met with them and strategized about how to neutralize the demonstrations. This is information that we know because we were able to obtain it, but we cannot be expected to have every detail at this stage, and Iqbal doesn't expect it. This court has not historically expected it. We work with everything that we can, and we plead as much detail as we can, and they are on notice. The defendants are on notice that we are focusing on what happened at the Port of Tacoma and the meetings that led up to the demonstrations, the meetings started in February, demonstrations started in March. We're focusing on what happened at the Port of Olympia. I guess my concern looking at the complaint is, is this really about, have you pleasantly alleged that this is about what you say, or is it more about the fact that you're there on the scene posing, at least in the eyes of some, a threat to the port, having nothing to do with the substance of your statements? Well, first of all, a threat to the port is occasional acts of non‑violent civil disobedience. That's the window of hindsight. They're certainly acting responsibly to get intelligence information, even on a group that has no history of violence. They have a port to protect. So is your allegation that you've been mistreated, falsely arrested, et cetera, because of the content of what you're saying, or because you're there on the scene posing a threat? Both. A nuisance, if you will. There was a plan to disrupt, and was disrupted, legal demonstrations on sidewalks, in public locations, and even if that were true, it does not justify disrupting people's households so that the households disintegrate and the tenants get evicted. It doesn't justify creating a list of license plates of organizers, which we allege specifically, and that those people were stopped over and over and over. If you're trying to prevent someone from doing a non‑violent demonstration at a port, then you don't arrest them ten miles away because you have their license plate. We settled the case, Chin v. Blankenship, based on a man who was arrested on his way at 10 o'clock in the morning to the port of Grays Harbor because he was supposedly drunk. We got the attempt to locate Green Ford Taurus, three known anarchists in the car. When you apprehend them, let Aberdeen know. Towery came up with that list of license plates. We have documents that say so, which is why we said so in the complaint. If you're trying to prevent a threat, then you prevent that threat. You put the police at that port. This is a public port. These are public streets. This is not a military exercise. This is to be handled by civilian law enforcement. They are not merely gathering intelligence. They're arresting people who are sitting in a street lawfully because the street is closed and having them arrested for attempted disorderly conduct because they're afraid they might do a sit‑in and block the movement. They didn't. They were in a closed street. The equipment went out an entirely different way. They were all arrested. There's only one case that we've ever found on attempted disorderly conduct. The Vermont Supreme Court said there is no such charge. Okay. Well, you're over time, but if you have one thought to leave us with in summing up. Yes. The burden is simply it's still notice pleading. We have to give notice as best we can pre‑discovery of every allegation that we have. The court below found them to be plausible, which doesn't mean they have to be true, and we have told every bit of the story that we can. We've put them on notice of what the allegations are. Our fear is that the defendants are trying to hide these illegal actions and military actions that the military should not be doing, law enforcement, behind Iqbal, and they have tried to raise the standard well beyond notice pleading into something so insurmountable that no one can meet the hurdle before discovery. Okay. Thank you very much. Mr. Brennan, why don't we give you two minutes and we'll give Mr. Angeles two minutes. One issue that came up earlier, and Judge Fletcher, you asked it, is that we're wrestling with Iqbal Twombly, and what is the standard and what is expected in a complaint? Okay. Well, I just want to reference the Mendocino case in 1994, I believe it was. In that case, one of the elements of the cause of action was impermissible motive intent, intent to infringe on somebody's First Amendment right. The complaint, the plaintiffs in that case, were able to establish that through circumstantial evidence. They were able to provide allegations that there were faulty affidavits filed. We know that case. Let me ask you something else. We were just informed, and I had not previously been aware of this, that the first challenge that your client made to this complaint under 12b-6 was to the Third Amendment complaint. Is that true? Correct. Is that also, well, Mr. Angeles can answer. Is it true for both defendants? Well, when you get up, you can say. Okay. But if that's so, it seems to me that the normal process is that if a complaint is challenged for insufficiency under 12b-6, it's a virtual automatic right to amend. Well, that is. And if this is the first time you challenge this complaint, when it's the Third Amendment complaint, I think the best you could hope to achieve is our sending it back to allow them to amend. That would be one option. This Court has discretion to do that. My position would be, though, Iqbal and Twombly predated the Third Amendment complaint. Yes, but it has been a very long established proposition that a district judge does not dismiss under 12b-6 without giving an opportunity to amend. It's almost an automatic reversal. Well, we ask the Court to dismiss it outright under an overview. I understand that's a possibility here. I don't think that a complaint could be amended. But at this point, there's no circumstantial evidence that would allow it to survive, and I see that my time is exposed. So thank you. Mr. Hanschels? I take it, by the way, that there's been absolutely no discovery of any sort in the case. Right. Okay. Just to build on Judge Fletcher's point briefly, the complaint was to the extent that Mr. Hilda's can't have it both ways. He can't allege that Mr. Towery and, you know, very tangentially, Mr. Rudd is responsible for actions of local law enforcement and then say that because the local law enforcement, you know, the allegations regarding local law enforcement have been changed significantly over the course of this. We certainly have not filed a motion to dismiss, however, until this one. I want to build on a question that Judge Deary asked regarding Paragraph 2.6 and refer helpfully, counsel for the plaintiffs has filed a response to our 28-J letter and has excerpted the actual allegations against Mr. Towery. And this is the sum total of the allegations against Mr. Rudd. Excuse me, I missed both. Against Mr. Rudd. And once the court strips out the conclusory matter and the matter for which there is simply no support, as in Paragraph 2.6, which is what happened in Moss 1, there are not plausible allegations that Mr. Rudd is responsible for unconstitutional action. And then very briefly on a few of the other things that the plaintiffs mentioned, regarding the meetings and the sort of military language that's discussed, none of that gives rise to an inference either of impermissible motive or any unconstitutional acts. There's no doubt that plaintiffs have pleaded that Mr. Rudd instructed Mr. Towery to infiltrate this group and to use an alias. But under Presbyterian church, that's exactly the type of conduct that was not a violent act. Correct me if I'm misunderstanding this, but my understanding of impermissible motive in a case like this, the motive that is impermissible is a motive to do acts that violate the Constitution. It is not necessary to show, I intend to violate the Constitution. I intend to do these acts that violate the Constitution. The qualified immunity of the question then is, would a reasonable person have known that these violated the Constitution? But I see nothing that requires a showing that the defendants intended to violate the Constitution. They need to show that they intended to do acts that violate the Constitution and to show that a reasonable person would have known that these acts violate the Constitution. Am I wrong? I think that's more or less correct, but what I would say, Your Honor, is that it has to be an intention to disrupt First Amendment activities and a knowledge that that disruption would violate the First Amendment rights and the Fourth Amendment rights of the plaintiff. So when you look, for instance, if the acts are consistent with a non-violation of the Constitution or consistent with constitutional conduct, then basically because it's a specific intent offense, tie goes to the defendant and there's no claim that's stated against the defendant. Thank you, Your Honor. For that reason, we ask that this case be reversed and really the district court should have the ability to decide whether or not there should be an amendment or not in this case. Thank you, Your Honor. Thank you very much. Thank both sides for their arguments. The case of Panagakos v. Towers is now submitted for decision. Thank you, Your Honor.
judges: Dearie, Fletcher, Fisher